**VARIOUS UNDERWRITERS AT LLOYD'S, LONDON, Plaintiff,**

v.

**MIKE J. THIEL, INC., Defendant.**

**Civ. A. No. 82–C–1615.**

United States District Court, D. Colorado.

Feb. 2, 1984.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

Plaintiffs, Various Underwriters at Lloyd's, London (Lloyd's) sued as subrogees to recover the amount they had paid for an aircraft hull loss on a helicopter that crashed. Their net subrogable loss, after deducting salvage value, was $279,994.55.

Plaintiff claims that the defendant's negligence caused the crash. Defendant Mike J. Thiel, Inc. (Thiel) denied any liability, asserting that the crash was caused by pilot error for which it had no responsibility.

Jurisdiction is predicated upon diversity of citizenship. 28 U.S.C. § 1332. The case was tried to the court for three days from Thursday, January 5, 1984 through Saturday, January 7, 1984. This memorandum constitutes my findings and conclusions as required by Rule 52(a), Fed.R.Civ.P.

## I. FINDINGS OF FACT.

Based upon the stipulations of fact entered into by the parties and upon evidence at trial, I find the facts to be as follows:

A Bell 206 helicopter insured by the plaintiffs crashed at approximately 4:00 p.m. on August 25, 1981 while working near Piceance Creek northwest of Rio Blanco, Colorado. At the time it crashed, the helicopter was being used in powerline stringing operations pursuant to a contract between its owner (the plaintiffs' insured), and the defendant Thiel. The crash resulted in a total loss of the helicopter. Pursuant to insurance policies providing aircraft hull coverage, the plaintiffs paid their insureds, Ex-Air, Inc. and Bell Helicopters/Textron, Inc., $321,100, then sold the helicopter's salvage, upon bids, for $42,668, from which they deducted $1,562.55 in expenses of retrieving, transporting and storing the salvage. This resulted in a net salvage recovery of $41,105.45. Thus the plaintiffs, as insurers, having paid the loss, are subrogated to the rights of their insureds in the net amount of $279,994.55,

William White, Hamilton & White, Denver, Colo., for plaintiff.

Gilbert A. Dickinson, Littell & Dickinson, Denver, Colo., for defendant.

the balance after deducting the net salvage recovery.

Any negligence of Ex-Air, Inc., including any negligence of the pilot who was flying the helicopter when it crashed, is to be imputed to the plaintiff insurors.

The helicopter pilot, Dennis Freeman, testified at trial. He was an employee of Ex-Air, Inc., and prior to this accident had substantial experience as a helicopter pilot. He had no prior experience, however with powerline stringing operations. He did hold all appropriate ratings and certificates required by the Federal Aviation Administration and had been approved by that agency to conduct operations such as this one. Freeman had learned to fly helicopters while serving in the United States Army. At the time of this crash, he was 34 years old, and a Viet Nam veteran with approximately 3,400 flight hours in his fourteen years experience as a helicopter pilot.

Defendant's employees had substantial experience in wire-stringing operations but not in using a helicopter to string wire. Defendant's project superintendent, Don Chesser, and its general foreman, Bobby Hodge, had been involved in two similar powerline stringing operations with helicopters in 1978.

At the time of this accident, the defendant Thiel was engaged in constructing twenty-one miles of 138-KV transmission line for Colorado Ute Association. Pursuant to an oral contract, Ex-Air's helicopter was to be used for one day to pull each of five transmission wires 10,000 feet from a point on a ridge north of Piceance Creek, across a valley, to a point on a bluff south of the creek.

From approximately 8:00 a.m. until about 3:00 p.m., Freeman, using the helicopter, pulled the five transmission lines from a Pengo model TR-5-PLW-3.5 five drum puller located at the northern starting point, for a distance of 7,000 feet. During this initial phase of the operations, the first 7,000 feet, all five lines were pulled off free-wheeling spools on the multiple drum Pengo puller.

At about 3:00 p.m., however, Freeman was told that the job would be completed by pulling in the opposite direction from a single spool or single drum puller the remaining 3,000 feet of the 10,000 foot span. I find, based on conflicting evidence, that Freeman was not informed or warned that, in contrast to the equipment that he had used all morning and most of the afternoon, the single drum puller did not have free-wheeling spools. Rather, the line had to be paid out mechanically by a motorized, geared mechanism, with the speed of pay-out controlled, at least to a certain extent, by the operator on the ground. Thus Freeman was not given notice that when the slack on the line had been taken up, there might be a very sudden pull backwards on the line to which his helicopter was attached.

From conflicting evidence, I find that on the very first attempt to pull the rope from the single drum puller, the helicopter, while flying at a reasonable speed for the work and conditions, was suddenly jerked to a stop when it came to the end of the slack in the line, and was then jerked backward. At that time the pilot lost control as the helicopter was tipped to a sharply angled position, and he was unable to regain control. It then veered off, more or less flying itself, to the pilot's right, and crashed.

The helicopter was equipped with a release mechanism by which the pilot could have jettisoned the pulling line. He did not, however, do this because he was concerned that the falling line would injure the men working on the ground. Thus the line remained attached to both the helicopter and the single drum Pengo puller on the ground until the helicopter crashed.

I find that with respect to powerline construction using helicopters, the defendant's ground crew had knowledge superior to that of Freeman, who had no experience in this kind of work. The defendant's employees Chesser and Hodge had worked on at least two prior similar jobs using helicopters.

### Conclusions of Law.

On the above facts I conclude that powerline construction in mountainous terrain using helicopters is an inherently dangerous activity which requires that all participants, including the helicopter pilot as well as all ground crew personnel, exercise the highest degree of skill, care, diligence and foresight according to the best available technical, mechanical and scientific methods. Conducting this kind of inherently dangerous activity, the defendant had a duty to use all reasonable and practical steps to assure the safety of those engaged in the operation.

I find and conclude that the defendant's construction superintendent was in overall control of the operation, and that he or some employee under his supervision had an affirmative duty to provide adequate prior warning to the pilot, Freeman, of all aspects of the late afternoon operation which differed materially from the earlier modus operandi. That is, the defendant had an affirmative duty to warn the pilot that the ground equipment to be used in the late afternoon was quite different from that used in the morning and especially that its spool was not free-wheeling. I find and conclude on the basis of conflicting evidence that no such notice or warning was given and that the pilot was not informed that the spool on the equipment used after 3:00 p.m. was not free-wheeling like those on the equipment he had been pulling from till then.

■ I further find and conclude that the defendant breached its duty to provide its crews adequate training, information, and communication equipment for the safe conduct of the operation in cooperation with the helicopter pilot.

Specifically, I find and conclude that the defendant provided inadequate equipment for ground-to-pilot communication. There was no communication equipment allowing the operator stationed at the payout truck to communicate directly with the pilot. Had such equipment been provided, there could have been a warning that the helicopter was approaching the end of the rope's slack and the pilot could have stopped or slowed the helicopter before it was suddenly jerked to a stop and out of control backwards. I find and conclude that in each of the respects mentioned, the defendant's employees, for whom it is vicariously liable, were negligent.

■ I further find and conclude that the pilot, Freeman, was negligent, and that his negligence is imputed to the plaintiffs as subrogees. I find and conclude that the plaintiff failed adequately to inform himself regarding the type of payout equipment to be used after 3:00 p.m. He also was negligent in failing to determine that the ground crewmen stationed at the payout truck did not have adequate communication equipment to speak with him directly. Further he was negligent in failing to look and see that the tension in the rope was rapidly being eliminated as he pulled away from the point. I conclude that if the pilot had been watching the plumb bob on the lead rope more closely, he probably would have been warned in time to have prevented the accident. The pilot Freeman's negligence is attributable to the plaintiffs.

Thus having found and concluded that there was negligence attributable to both parties, it is necessary under the Colorado comparative negligence act to apportion that negligence between the parties. Having fully considered all of the evidence and the arguments of counsel, and on the basis of conflicting evidence, I apportion the negligence 45% to the plaintiffs and 55% to the defendant.

IT IS THEREFORE ORDERED that the plaintiffs' claim for relief is granted and the defendant shall pay plaintiffs the sum of $155,997.00 plus interest to be computed from the date of the accident at the statutory rate. Plaintiffs shall recover their costs upon the filing of a bill of costs within ten days after entry of this judgment.